NicholsON, C. J.,
delivered the opinion of the Court.
About the year 1842 John Ward, being then a citizen of North Carolina, determined to remove to Tennessee. He was the owner of a woman slave named Kissee, who had for her husband a man slave named Csesar, who belonged to an uncle of Ward, living in the neighborhood. To avoid separating Kissee and her children from Csesar, Ward purchased him, and at the time agreed with Csesar, that, “ after they reached Tennessee, he should have his time by repaying the amount paid for him.”
In 1843 Ward removed to Dyer County, Tennessee, bringing with him Csesar and his wife and their children. About a year after they settled in Dyer county Csesar reminded his old master of his promise, and informed him that he had the money and was ready to pay for himself. Ward received the money, and “ let Csesar set up for himself.”
By way of assisting him, Ward leased a piece of land in his immediate neighborhood, and gave it up to Csesar to cultivate for his own benefit. From this time Csesar ceased to have a master, and was thrown upon his own resources. He was industrious, frugal and ener *110 getic in carrying on bis little farm. He was cautious and shrewd in his dealings, and soon gathered around him a competency of all the necessaries and conveniences of life. He built himself a ‘house on the lease, and then Ward allowed his wife, who continued a slave, r to go and live with her husband. Soon afterwards Csesar bought his wife from Ward, with the view of securing her freedom.
After a few years of prosperous management of his affairs, Caesar heard some intimation that, if his old master should die, he might again be returned to slavery by one of his sons. He suggested his fears on this subject to Ward, and requested him to make a bill of sale of him to a friend in the neighborhood, Edmund Warren, in whom he had full confidence, and who would stand for him as his protector and trustee. This was a common mode by which the rigid laws against increasing the number of free persons of color in the State by emancipation was evaded. Ward consented to Caesar’s suggestion, and, upon Warren’s agreeing thereto, the arrangement was carried out by the execution of a bill of sale of Csesar by Ward to Warren. Under this arrangement Csesar was virtually free, except that the State had not given her consent.
Caesar’s good conduct and his prosperous management secured for him the respect and friendship of his white neighbors. Among them was one named James McCoy, who succeeded in so completely winning the confidence ”of Csesar, that he induced him to apply to Warren to transfer the guardianship of himself to McCoy. It seems that Warren had some misgivings as to the de *111 signs of McCoy, and hence he deemed it prudent to consult Ward on the subject before making the transfer. After consulting with Ward, and having a full understanding with McCoy as to the character of the trust he proposed to assume, Ward, by way of impressing him strongly with the necessity for his acting faithfully and honestly in the matter, intimated some fears on the subject, when McCoy replied, with emphasis, “any man who would belie the trust confided to him about the old negro would be the meanest man in the world.”
McCoy was so profuse, and apparently so honest, in his protestations of friendship for the old negroes, and in his promises to give them assistance as well as protection, that Ward and Warren yielded, whereupon the bill of sale was made as desired by Caesar and McCoy. When the bill of sale was signed, McCoy said to Caesar: “I will stand up to you now and protect you — I have been sorry for you, and have done this for pity’s sake.” About this time McCoy removed to a different part of Dyer county, about fifteen or twenty miles from Ward. He carried with him Csesar and his wife, and all of their stock, consisting of horses, hogs, etc.; their farming implements, household furniture, provisions, etc.
For about a- year Csesar’s situation was satisfactory; but about that time McCoy commenced curtailing his liberties and treating him as a slave. At length, upon Cmsar’s manifesting too much dissatisfaction • with the restraint imposed on him, McCoy asserted the right to inflict corporal punishment upon him, whereupon Csesar *112 ran away and returned to bis old master for protection. Ward and Warren at once determined to investigate the matter, and see that Csesar was protected. Warren visited McCoy, who smoothed over his conduct, and expressed entire willingness that Csesar should return to his old neighborhood and again put himself under the protection of Ward and Warren. He assured Warren that if Csesar would return and make some little acknowledgments, he might gather up his property and return to his old neighborhood. Upon returning home, he told Csesar the message sent him by McCoy, and, therefore, he agreed to go back to McCoy’s for his wife and property.
When Csesar reached McCoy’s house, he was immediately seized and committed to the jail of Dyersburg as a runaway negro. Having deposited Csesar in jail, McCoy went to a blacksmith in the town, named "Vaughn, to have a pair of handcuffs made for Csesar. Vaughn proposed to buy him, having no knowledge of his claim to freedom. The trade was made on the condition that he should be sent South and sold. Vaughn paid McCoy $500 for Csesar and his wife, and immediately carried them to Memphis, where they were sold to Forrest & Hill, who kept a slave mart in that city. In a short time they were sold to C. R. Jam-eson in Mississippi, where they were carried. Before selling them to Vaughn, McCoy had made such threats against them in the event they disclosed their claims to freedom, that they remained several years with Jam-son before they ventured to allude to their true condition. But at length they mustered up courage, and *113 told Jameson that they were free, and how they had been deprived of their freedom by McCoy, and referred him to their old master, Ward, for the truth of their statements. Jameson wrote to Ward, and soon received a letter, fully confirming the story told by Csesar and Kissee. He immediately set them at liberty, and they returned to their old home at Ward’s; but in a short time they concluded to go back and live with Jameson, influenced, in all probability, by the threats made by McCoy.
Some time after returning to Jameson’s in Mississippi, he removed to Arkansas, the old negroes going with him. Csesar soon afterward died in Arkansas, about 1860, and in 1861 Kissee died in Memphis. They left several children living in Dyer county.
Jameson came to Dyer county, took out letters of administration on the estate of Csesar, and filed this bill to make McCoy responsible for the property of Csesar, for the amount received for the two negroes from Vaughn, and for their services.
Upon the filing of this bill, containing the allegations already detailed, McCoy filed a demurrer, and assigned the following causes of demurrer:
1. “The bill does not show that the County Court of Dyer had jurisdiction to grant letters of administration on the estate.
2. “The bill shows and charges that Csesar bought his freedom of Ward, his former owner; this contract was in violation of law and void.
3. “It seeks to recover his wages, etc., and asks the price he sold for. This can not be done; his pur *114 chase did not invest him -with his freedom and enable him to maintain the suit.”
The Chancellor overruled the demurrer; and thereupon McCoy, by leave of the Court, appealed from the decree overruling his demurrer to this Court. At the April Term, 1868, of this Court, the holding of the Chancellor was affirmed, and the cause remanded for plea or answer.
Defendant McCoy answered, proof was taken, sustaining fully all the allegations of the bill, when an account was ordered to be taken, in which the Clerk and Master charged McCoy with the $500 received of Vaughn and interest, with the value of the personal property left by Caesar at McCoy’s, and with the services of Caesar and Kissee, from the time they Avent to McCoy’s until they died, the whole amount of the charges Avith interest being $4,000.
Defendant McCoy excepted to the report:
1. Because Caesar and Kissee being slaves could not hold property.
2. The valuation of the horses was too high, and there was no proof that he got the other articles.
3. The suit is barred by the statute of limitations.
4. The estimate of hire is too high, and it is charged for too long a time.,
5. Because he. is charged with $500 received of Vaughn.
The Chancellor sustained so much of the exceptions as relate to the personal property, except the horses, and to the hire from the time McCoy sold the negroes to their death, and as to the other exceptions, they were *115 disallowed. The report being corrected, the amount of charges was reduced to about $2,000, for which a decree was rendered. From this decree both parties appealed to this Court.
The first question raised in the argument is, whether the judgment of this Court, at its- April Term, 1868, overruling the defendant’s demurrer, and remanding the cause for plea or answer, is conclusive upon this Court as to the matters adjudged by that decree? The answer to this question depends upon the settlement of another question — whether the decree at the April Term, 1868, was an interlocutory or a final decree? In general, an appeal can be taken to this Court only from final judgments or decrees. But by special statute, several exceptions to this rule are provided for, and among them is the discretion given to Chancellors to allow appeals from decrees overruling demurrers. The object' of this exception to the general rule is obvious. It is intended to save parties the trouble and expense of' going through a long course of litigation, before having it finally determined whether, upon the face of the bill, the Court has the jurisdiction to grant the relief prayed for. The sole object, therefore, of such an appeal, is to obtain the final adjudication of the questions raised by the demurrer. If the decree rendered in such case be not final, then nothing is accomplished by the appeal. We hold, therefore, that the decree rendered by this Court at its April Term, 1868 was final and conclusive as to the matters passed upon, and that it is as binding on this Court as it was on the Chancery Court. All the *116 legitimate consequences of the doctrine of res adjudi-eata belong to that decree. The ■ demurrer raised the question, whether the County Court of Dyer had the jurisdiction to grant letters of administration on the estate of a person occupying the anomalous position occcupied ■ by Csesar at the time of his death? This question strikes at the foundation of the bill. In passing upon it, the Court necessarily passed upon the status of Caesar — whether he was a free man or a slave, or whether he was neither a free man nor a slave, but occupying an intermediate position, in which, in the enjoyment of an inchoate right to freedom, he could lawfully acquire and own property. It was impossible for the Court to overrule the demurrer without adjudicating the jurisdiction of the County Court to grant the administration; and, as this jurisdiction could rest only on the ground that Caesar was a free man, or that, as a quasi free man, he had a right to acquire and own property, the conclusion is inevitable that the Court so adjudicated in overruling the demurrer. While this Court, in the undoubted exercise of its legitimate powers, can review, modify or reverse the decisions of its predecessors, made in other causes that have been settled and disposed of, yet such modification or reversal can have no effect on the rights or interests involved in those cases, but can only furnish the law for present or subsequent causes.
This exact question was decided by the Supreme Court of California, in the case of Dewey v. Gray, Cal. Rep. 374, in which the point is thus stated: *117 “This Court having once decided in this case, that if the landlord entered on his tenant’s premises without his consent before the expiration of the lease, and re-let the premises to another, such re-letting discharged the tenant from his contract, except to such part of the rent as had accrued at the time of the re-letting, which the landlord was entitled to recover. Though the latter portion of this decision is in abrogation of one of the plainest principles of law, yet, the decision having been made in this case, it has become the law of the case and is not now the subject of revision.” So, also, the adjudication of this Court in April, 1868, in the present ’ case, settled the law of this case, and settled it beyond the power of modification or reversal by the present Court: Cooley’s Const. Law, 47; Overton v. Bigelow, 10 Yerg., 48.
But in thus recognizing and applying the doctrine of res adjudicata, it is not to be inferred that we have any doubt that the decree of this Court made in 1868, was sustained by sound legal principles. The argument, that the County Court of Dyer had no jurisdiction to grant administration on the estate of Caesar, rests entirely upon the assumption that he was a slave when he died, and consequently incapable of owning property. Reasoning from this assumption, the conclusion is logical. But the argument overlooks the fact, that it does not follow that Caesar was subject to all the disabilities of a slave, because he was not invested with all the rights of a freeman. Whether Caesar was a slave or a freeman, was not the question on which the jurisdiction of the County Court *118 depended — but did be have the right to possess and own property?
The policy of our State on the subject, of emancipation was marked by great liberality until the year 1831, when the public mind began first to be agitated by discussions in the Northern States of the question of abolishing, slavery. By the acts of 1777 and 1801, the County Court was authorized to give the assent of the State to the emancipation of • slaves, upon the simple condition that the slave should give bond that he would not become chargeable upon the county as a pauper.
A more rigid policy commenced in 1831, when it was enacted, that no slaves should be emanaipated except upon the condition of removal from the State. This policy was based upon the belief that the peace-of the' State would be endangered by an increase of the number of free colored persons. But at that time many slaves had contracts with their owners for their future emancipation, which contz-acts could not then be executed, except upon the condition of leaving the State. In 1833, the Legislature provided a remedy for such cases, by enacting, that the act of 1831 should not extend to the case of any slave who had bona fide contracted for his freedom, previous to the passage of said act. This was an express recognition, by statute, of the rig-ht of a slave to make a valid contract with his owner for his freedom. But there was no other subject about which a slave could make a valid contract, except as to his freedom.
In 1834, the leading case of Fisher’s negroes v. *119 Dabbs (5 Yerg., 119) was determined. In that ease Judge Catron, delivering the opinion of the Court, held that “the idea that a will emancipating slaves, or deeds of manumission, is void in this State, is ill founded. It is binding on the representatives of the devisor in the one ease, and the grantor in the other, and communicates a right to the slave; but it is an imperfect right, until the State, the community of which such emancipated person is to become a member, assents to the contract between the master and the slave.” He held also that, “as between Peter Fisher and his slaves, his will on his death was a deed of manumission. Legislation in respect of manumission aside, and they owed no personal services to the representatives of Peter Fisher, were as free agents- as themselves, and as capable of enjoying every natural right. Being in the enjoyment of natural liberty, of course they had a right to the enjoyment of the property devised to them by their late master.”
This case distinctly recognizes the validity of a contract for freedom between the master and the slave. But, in the case of Lewis v. Simonton, decided in 1847 (8 Hum., 185), Judge McKinney defined, with still more clearness, the status of a slave who had contracted with his owner for his freedom. He said: “By the common law, the master, by his own act, might manumit his slave by parol; and that manumission would even be inferred from the acts and conduct of the master. 2 Black. Com., 95. In this State, by virtue of statutory prohibition, emancipation can not take place without the consent of the government. Never *120 theless, the owner may part with his right of property in the slave as fully as at common law, and thereby vest him with an imperfect right to freedom. This may be done by deed or will, or even bjy parol contract with the slave; and if in either of these modes the master has parted with his right, nothing remains to be done to entitle the slave to his freedom but the assent of the government. But, until such assent is given, the legal character and condition of the slave is changed. His relations to his former master and to the community arc likewise changed. By the act of the master, imparting to him an imperfect right to freedom, he ceases to be in the state and condition of slavery; ceases to have an owner or master,' within the meaning of the law. In Lewis v. Daniel, 10 Hum., 314, decided in 1849, Judge Turley held, that “a devise of freedom is a substantive thing, whether it be recognized by the State or not, and that no one but the State can interfere in relation thereto.” He added: “The slaves acquired a right to their freedom inchoate, and they have the right to ask the protection of the law therefor, as far as it is given.”
These decisions, as well as many others that might be cited, serve to illustrate the liberal spirit with which the judicial department of our State has always investigated and determined questions involving the claims of slaves to their freedom.
From these authorities we can readily understand the legal status of Csesar after his old master, Ward, about 1844, upon receiving the amount for him, allowed him *121 to set up for himself. From that moment Csesar ceased to have a master or owner; he ceased to be a slave, but he was still not á freeman, yet he was capable of holding property. The State alone was concerned in the question, -whether hé should become free, or whether, because he was not entirely free, he should remove from the State. It matters not that he was remaining in the State in opposition to the then policy of the State. His imperfect right to freedom was not thereby affected. So long as the State did not object, his right to remain and to exercise all the privileges which attached to his new situation and condition, could be interfered with by no one. He was master of his own time and. of his own conduct. He could labor and receive the reward therefor. He could not sue and be sued, but he could hold and possess the fruits of his industrious earnings, and none could question his title thereto. Having removed from the State, and died the owner of the property which he left behind him in Dyer County, and the policy of the law having since so changed as to invest his children with the rights of freemen, and with the capacity to take property by-descent or distribution, the County Court of Dyer had jurisdiction to grant administration upon Cassar’s estate.
The first exception to the Master’s report was, therefore, properly disallowed.
The next exception, as to the charge for the horses and other articles of chattel property, was properly disallowed as to the two horses, but its allowance as to the other articles of personal property was erroneous, *122 and is reversed, and the account will be corrected accordingly.
The exception as to the allowance -for the services of Csesar and Kissee was well taken as to the time that elapsed from the date when complainant found out they were not slaves and sent them back to Ward’s, in Tennessee, until they died. But as to the allowance for their services from the time they went into McCoy’s service, which appears to have been about the 1st of August, 1850, until about August or September, 1856, when they were released by complainant, the exception was not well taken, the same having been settled by the decree of April, 1868, of this Court.
The account will be corrected accordingly.
The exception as to the $500 allowed as the price of Cassar and Kissee, received by McCoy from "Vaughn, was not well taken, and was properly disallowed. This matter was adjudged by the decree of this Court at its April Term, 1868, and can not now be revised or reversed.
The Clerk of this Court will re-cast the account, making the corrections indicated, and report to the present term, until the coming in of which report • other matters will be reserved.